Our fourth case for argument this morning is United States v. Thomas. Mr. Vaughan. Thank you, Your Honor, and may it please the Court. Stephen Vaughan for Defendant Appellant Julian Thomas. The sentence on count two should be vacated and remanded for resentencing consistent with the jury's verdict here. The District Court imposed a seven-year mandatory minimum sentence on count two without the jury finding that Appellant had advanced knowledge that his co-defendant, Thompson, would be brandishing the firearm. This sentence runs headlong into the Supreme Court's decision in Alleyne v. Rosemond and is particularly hostile to this Court's decision in Armour. This Court should also vacate and remand for new trial. The District Court's several trial errors resulted in error to admit the Probation Officer Ellestad's testimony, as established by this Court in Beck. It was an abuse of discretion to admit the jail phone call, which… I know you weren't trial counsel, so you're not responsible for the failure to object to trial. But aren't we limited to review for plain error here? On the jail phone call? On almost everything, it looks like. Well, I respectfully disagree, Your Honor. The trial counsel did object to the admission of the jail phone call. He objected for cumulative reasons and on prejudice grounds. Now, the government argues that our prejudice argument or objection wasn't specific enough about why it would be prejudicial, and I… Other than the jailhouse phone call, was there anything that produced an objection in the District Court? Not issues that we raise in the brief, yes. Okay. Yes, so most of the arguments on… You are facing a big headwind. Not in your making, but it's one you need to cope with, if one can. Certainly, Your Honor, and I would argue that it was plain error to admit the Probation Officer's testimony, and in that, for example, the court said that even if it was necessary for the Probation Officer to testify, the District Court should not have allowed the Probation Officer to state her job title. Here, the Probation Officer not only stated his job title, but he also stated that he was an appellant's probation officer. The government is telling us that this could not have come as a surprise to the jury in light of the opening statements in which the defendant fronted his own criminal record. Yes, certainly. It's hard to see how that becomes so prejudicial as to call for a new trial in the absence of an objection. Certainly, Your Honor, and the government makes this argument several times in the brief because the issue of criminality is a repeat error, in our view. But the decision by the District Court had been made pre-trial, whether to allow some of these things, criminality into evidence. So, of course, during opening, counsel is going to make this strategy to get out in front ahead or get out ahead of some of those negative facts. But opening the door doesn't give the government carte blanche to continue to beat the drum into the jurors' minds. And it was unnecessary. There was no reason to. Well, who else tied the defendant to the cell phone? Was there anybody other than folks who were involved in the robbery? There was an FBI agent who testified that his compass notes in his record showed that the defendant had given the prior FBI agent who was handling the case. Excuse me, it might not be the FBI agent. Yes, it was the FBI agent. He linked that phone number to the defendant and the co-defendant. How did the FBI agent link that? Can you remind me? In the FBI record, in the case records for the investigation, the prior FBI agent who was handling the case received the phone number from the defendant. The defendant gave the agent that as his phone number at some later time when they were investigating. Yes, and I believe it was two years later. Okay. Two years after the robbery. You see my point. That is, you don't have any contemporaneous linkage to that cell phone from anybody who wasn't involved in the robbery. Other than the probation officer whose credibility presumably is going to be a little bit better than the co-defendants or the co-conspirators. That's quite right. Okay. Could we talk about the rather confusing evidentiary record concerning this phone call? We got this rather unusual letter from the government yesterday. Yes, and I was surprised by that too. I was grateful for the government's last minute diligent efforts to uncover this fact. I went back through the records that I received from the Federal Defender's Office, and there's no audio recording in there. I had called the court clerk to obtain the exhibits last year, and the clerk told me that they don't maintain the exhibits and that the parties do. I don't have the audio, but I assume that the audio matches up with the transcript that the government attached to its brief. The jury is reading along a transcript as the audio is being played in the courtroom. The audio does not get retranscribed into the record. Let me ask, did anybody in the trial propose what would seem to me like at least a potential compromise for dealing with that phone call, and that is simply to put the content of the call in without the jail context? Was that proposed? That was not proposed. They had trimmed down some other inflammatory language, and then the trial counsel, the district court, gave the parties an opportunity to stipulate within a few days. They couldn't stipulate as to value. I understand that. There was a difference in the stipulation of the value, and that's why the government liked the $30,000 remark on the phone call, because this car was clearly not a $30,000 car. It had 150,000 miles on it. It was five years old and had bullet holes in it. Does Kelley Blue Book have adjustments for bullet holes in their programming? I don't. That might be a feature on the Kelley Blue Book app. I haven't found it yet. But back to the government's letter, I think this actually makes our argument stronger, because now without this, the $30,000 remark was the main reason why the government wanted to introduce this jail phone call in the first place. And without that remark, the entire phone call is even more cumulative. It's just as prejudicial because you're raising the fact that he's in jail. And it was just unnecessary to, it was even more erroneous to infer the purchase price from the stated value when the jury never got to hear the stated value. So the very premise of the government's argument throughout trial was that this was the disposition of the robbery proceeds. And the only reason we raised this, we cross-examined law enforcement officers about their failure to find any money on him or in the car was because the government was going to introduce the $30,000 remark. And it's a neat number for the government because it's nearly half of the bank robbery proceeds. So it makes a lot of sense. It just wasn't true. This court should also dismiss the indictment for, because the district court erred in denying appellant's request for severance. The government here argues that. My problem with that argument, Mr. Vaughn, is that it seems to rely completely on hindsight. That is, if you're being asked to, as a trial judge, to sever those two cases eight months before trial, why am I going to try this bank robbery twice, right? And it's only months later when the co-defendant pleads and the conflict disappears, that it turns out, gee, this was, if we had known all that eight months ago, we could have avoided this problem. But that depends on hindsight that's not available to the district judge. That's true, Your Honor. I would argue that for nearly all arguments about prejudice, whether the defense's theory was hampered, it's always going to be in hindsight. That's a necessary element of the test. But whether the delay was reasonable or necessary, not about whether. I understand that it obviously changed the game at trial a good deal. But to say that the district judge erred by denying the severance is a pretty steep hill, it seems to me. Sure. I would reframe that to say that the appellant's Sixth Amendment rights were violated when the district court denied severance. It's the focal point of the Sixth Amendment claim. I understand your point. It doesn't necessarily rise or fall with that decision. Thank you, counsel. Thank you. Mr. Lindsey. Hi. Stephen Lindsey, representative of the United States. I'd like to begin by trying to clarify a bit the question of the standard review and the phone calls. So it is true that the defendant objected to the admission of the phone calls. But he objected largely during the trial and before the trial, actually, on grounds largely of cumulativeness. He did add at Record Citation 148, pages 13 to 16, an argument about undue prejudice. But the argument about undue prejudice that he raised was simply one regarding the content of the calls. He claimed that the content of the calls and the statements that the defendant made in the calls made him look, quote, pathetic, slimy, manipulative. The actual jailhouse origin of the calls was never challenged, and the defendant was put on full notice of this before the trial. This is at Appendix 12. The government explained to the district court that during its opening statement it was planning on introducing the calls as saying to the jurors, you're going to hear evidence from the defendant in jail calls admitting to the purchase of the car, the value of the car, et cetera. And so the defendant was aware that these calls would be referred to as jail phone calls and yet never lodged an objection. So at least as regard to the label of the calls, we think that that should be reviewed for plain error, given no objection. As to any potential effect of the letter that the government filed yesterday, and again the government wants to reiterate that it regrets the error and particularly the timing of it, is that we don't think that it actually changes the calculus very much here. It is true that the easiest way perhaps to show the probative value of the phone calls was through the admission of the $30,000 value, but that wasn't the only thing that the government argued before the district court in the final pretrial conference. The government also argued that the fact that it was being referred to by the defendant as a luxury car, the fact that the defendant mentioned that it needed premium gas, that he was very distressed that another individual was driving the car, all went to the value of the car to him and more likely showed that he put many of the robbery proceeds into the car, even if, you know, the exact $30,000 value. And so we think that the... Was there any reliable evidence about how much money actually changed hands with that purchase? No, the government, I think this is on pages 17 and 18 of the appendix, the government was asked by the court if there was any more concrete evidence regarding the actual purchase of the car, and the government searched and couldn't find any. The only evidence the government was able to find in that regard was the fact that the car was registered to Miss Regina Williams. The defendant paid her in order to register the car under her name, but as far as the purchase itself, there was no other evidence found regarding the value. Also, I'd just like to turn briefly to the question about Officer Elistad's testimony. My understanding, looking at the second day of the trial transcript, pages 41 to 42, this is FBI Agent Brown's testimony. FBI Agent Brown largely provided testimony on the basis of his evaluation of phone records, which the defense sought to impeach, just as they sought to impeach the credibility of the Confederates. In this, I believe during their closing argument, trial transcript page, day two of the trial transcript, page 263, the defense argued that the phone records contradict themselves, essentially negating some of Agent Brown's testimony. My understanding also is that Agent Brown, on pages 41 to 42 of the transcript, mentioned that he had later performed a search on Mr. Thompson's phone, and in Mr. Thompson's phone, there was a number, what we later argued was the defendant's number, under the name Juice. But again, to a certain extent, because the FBI agent was simply testifying to what Mr. Thompson had put into his phone, and Mr. Thompson, an individual that the government was trying to impeach quite steadily, sorry, that the defense was trying to impeach quite steadily during the trial, it didn't allow Agent Brown's testimony to provide much weight. And I want to reiterate three, we think, big differences between this case and Beck. Number one is, of course, the standard of review. Beck was a case in which an objection had been lodged, and this court evaluated under the harmless error standard. In this case, as I think Your Honors mentioned, this is largely a plain error case, and so it's the defendant's burden to show a reasonable probability that but for Officer Elistad's testimony, he would have had a different result. Essentially, he'd have to show that Officer Elistad's testimony put the government over the top, which we think that he can't carry his burden showing. Another difference, we think, is the cumulative nature of the evidence in Beck and the non-cumulative nature of it here, simply because of the kind of impeachment evidence that was being offered against the government's other witnesses. And finally, a question about what the jury already knew. As you read Beck, particularly page 417 of that opinion, Beck makes clear, or at least indicates, I think, relatively clearly that the jury only learned of any prior bad acts by the defendant through the probation officer's testimony. Here, for all of the evidence put out in our brief, that simply wasn't the case. Turning next a bit to the jury instructions, the defendant invokes this court's decision in armor. We think that armor doesn't control this case. In armor, it was a clear, simple Allene error. The jury had never been asked to even find brandishing. And after having established that that error existed, this court then asked, well, was there a miscarriage of justice? And only reaching that question about trying to save the sentence from what otherwise would have been vacater, did the court try to assess whether or not the jury instructions were adequate on Rosman grounds and found that they weren't. This case is certainly different. The jury was asked specifically about brandishing. And in another difference from armor, the jury here did have an advanced knowledge instruction that was offered to them, and it was in count two, a count that was clearly connected by the statements of the district court in its instructions. This is particularly true, I think, between pages 214 and 218 of the trial transcripts day two, in which, I think, on page 217 to 218, the district court specifically says that the special verdict question is a subset. Essentially, the most natural reading, we would say, of these jury instructions was that on count two, the jurors were asked, do all 12 of you unanimously agree that the defendant aided or abetted any one of these three means, use, carry, or brandishing? The special verdict question is then a confirmatory question, asking the jury, during your deliberations on count two, where the defendant conceives there was an advanced knowledge requirement given during your deliberations on count two was one of the three things that you came to a conclusion on in count two, brandishing. And we think that that's the most natural reading. And moreover, because of the plain error posture of this case, the defendant's burden is not only to show potentially that the jury instructions were erroneous, but plainly so. And as this court, I think, has recently stated, a plain error is one that is not subject to reasonable dispute. It's not subject to fair debate. We certainly think that even if our reading is maybe perhaps not the most natural reading of the jury instructions, it is at least a reasonable one, and one that the defendant can't carry his burden on. Finally, regarding the advanced knowledge requirement, we would argue that in any event, even if our reading is not the most natural, even if our reading is not even reasonable, there is no miscarriage of justice here because of the overwhelming evidence of advanced knowledge in this case. There is no doubt that this was a robbery in which the defendant participated in the planning of, and in which it involved intimidation as a key ingredient. And that intimidation was not going to be used through any means other than showing bank tellers a firearm, getting them not to move. This is James Thompson's testimony, I believe on page 143 of the second day transcript, where he says, we didn't want the tellers pushing any buttons or anything out of fear that they would potentially alert the authorities. And it wasn't simply by carrying a firearm, and it wasn't simply by the element of surprise in terms of striking tellers. It was letting them know they had a firearm, showing it at the very least the defendant had advanced knowledge in the alleyway before entering the bank. This is, I believe, on page 141 of the second day transcript, Mr. Thompson's testimony, in which he said that we entered the alleyway, it was at that point I took the handgun that was otherwise in my pocket out, held it up, and we waited for up to 30 seconds. Under Rosemond, the government could contend that that was clearly enough time for the defendant to back out of the crime and to exit the situation and would suffice for advanced knowledge. If the court has no further questions, the government asks that it affirm the defendant's conviction and sentence. Thank you. Thank you very much. The case will be taken under advisement.